UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


GREAT NORTHERN INSURANCE
COMPANY, an Indiana corporation, and
FEDERAL INSURANCE COMPANY, an
Indiana corporation,

             Plaintiffs,

           and

AMERICAN STATES INSURANCE
COMPANY, an Indiana corporation,

           Intervenor Plaintiff,

    v.

CROWN PINE TIMBER 4, L.P., a Delaware
limited partnership,

           Defendant.
_____

CROWN PINE TIMBER 4, L.P., a Delaware
limited partnership,

           Third-Party Plaintiff,

    v.

AMERICAN ECONOMY INSURANCE
COMPANY, an Indiana corporation,

           Third-Party Defendant.

Case No. 3:18-cv-2104-YY

OPINION AND ORDER

YOU, Magistrate Judge:

Before the court are motions for summary judgment filed by plaintiff Great Northern Insurance Company ("Great Northern") (ECF 44), intervenor plaintiff American States Insurance Company ("American States") and third-party defendant American Economy Insurance Company ("American Economy") (ECF 40), and defendant and third-party plaintiff Crown Pine Timber 4, L.P. ("Crown Pine") (ECF 39).  For the reasons discussed below, Great Northern's motion is GRANTED in part and DENIED in part, American States and American Economy's motion is GRANTED, and Crown Pine's motion is GRANTED in part and DENIED in part.[1]

## I.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Once the moving party does so, the nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id*. at 324 (citing FED. R. CIV. P. 56(e)).  As stated by the Ninth Circuit Court of Appeals: "This burden is not a light one. . . . In fact, the non-moving party must come forth with evidence from which a jury

---

[1] The court has subject matter jurisdiction over this action because the parties are completely diverse, 28 U.S.C. § 1332(a)(1), and personal jurisdiction over defendants as none have objected otherwise.  *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704 (1982).  All parties have consented to allow a magistrate judge to enter final orders and judgment in this case in accordance with Rule 73 and 28 U.S.C. § 636(c).  ECF 48.

could reasonably render a verdict in the nonmoving party's favor." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted).

The court "does not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999). "Reasonable doubts as to the existence of material factual issue are resolved against the moving parties and inferences are drawn in the light most favorable to the non-moving party." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## II.    Background and Procedural Posture

In 2007, Crown Pine assumed a Surface and Lease Agreement ("the lease") for timberlands in Louisiana owned by Crosby Land & Resources, LLC ("Crosby"). David Rossmiller Decl. ("Rossmiller Decl."), Ex. 1, at 1, ECF 42-1. The lease lapses on December 31, 2025. *Id.* at 10.

In early 2016, Crosby petitioned a Louisiana state court for specific performance of lease terms that required Crown Pine to produce documents and information periodically and upon Crosby's request. Compl., Ex. A, ECF 1-1. Crown Pine moved to compel arbitration, which the state court granted. Rossmiller Decl., Ex. 1, at 2, ECF 42-1. Early the following year, Crown Pine commenced the arbitration with a Demand for Arbitration, followed by an Amended Demand for Arbitration. Compl., Ex. B, ECF 1-2; *Crown Pine Timber 4, LP v. Crosby Land & Resources, L.L.C.,* Case No. 01-17-0001-9989.

In its Response to Amended Demand for Arbitration and Counterclaim, Crosby brought a counterclaim for breach of the lease and sought declaratory relief. Rossmiller Decl., Ex. 1., at 6, 9, ECF 42-1. As discussed in detail below, Crosby's counterclaim alleges Crown Pine encumbered Crosby's timberlands with "a wood supply agreement requiring Crown [Pine] to

provide unsustainable volumes of pulpwood and saw logs to certain paper and sawmills" and mismanaged the land in breach of the lease.  *Id.* at 10, 12.

Crown Pine tendered the arbitration counterclaim to its insurers for defense.  American States initially indicated it would defend the suit, but ultimately all the insurers denied tender of the counterclaim for defense.  Crown Pine Answer 4, 9, ECF 13; Crown Pine Am. Answer 2, 13, ECF 20.  Crown Pine also tendered the counterclaim to American States and American Economy under policies held by one of its agents, The Campbell Group LLC ("Campbell"), on which Crown Pine is listed as an additional insured.

Great Northern and Federal Insurance Company and intervenor plaintiff American States have brought suit against Crown Pine seeking a declaratory judgment that they do not owe a duty to defend in the arbitration.  Am. Compl., ECF 5; Intervenor Compl. 11, ECF 9.  Crown Pine filed a third-party complaint seeking a defense from American Economy under policies issued to an agent of Crown Pine on the basis it is an additional insured on those policies.  Crown Pine Ans. 13, ECF 13.  Crown Pine also seeks a declaratory judgment that Great Northern, American States, and American Economy each owe it a duty to defend in the arbitration.  Am. Answer, ECF 20.  American States and American Economy are Liberty Mutual insurance companies and, where appropriate, are referred to as "Liberty."

Per the parties' conferral, Crown Pine concedes the four policies issued by plaintiff Federal Insurance Company provide no duty to defend because Crown Pine is not listed as an insured on those policies.  *See* Great Northern Mot. Summ. J. 1, 9, ECF 44; Kevin Michael Decl. ("Michael Decl.") ¶ 11, ECF 45; *id.*, Ex. I, at 1, ECF 45-9.  Federal has not moved for summary judgment, and its policies are not at issue for purposes of resolving the motions presently before the court.  Crown Pine Mot. Summ. J. 4 n.3, ECF 39.

**III.    Relevant Law Regarding Insurance Policy Interpretation**

A federal court, sitting in diversity, applies state law to interpret an insurance policy.

*Travelers Prop. Cas. Co. of Am. v. ConocoPhillips Co*., 546 F.3d 1142, 1145 (9th Cir. 2008).

Under Oregon law, an insurer's duty to defend is a question of law.  *Hunters Ridge Condo. Ass'n*

*v. Sherwood Crossing*, LLC, 285 Or. App. 416, 422 (2017).

"The overriding goal in construing an insurance policy is to 'ascertain the intention of the

parties.'"  *Id.* at 422 (quoting *Dewsnup v. Farmers Ins. Co*., 349 Or. 33, 39-40 (2010)).  The

court determines "the intention of the parties by analyzing the policy's express terms and

conditions."  *Id*. (citing *Hoffman Const. Co. v. Fred S. James & Co*., 313 Or. 464, 469 (1992);

O.R.S. 742.016(1) (providing that, with some exceptions, "every contract of insurance shall be

construed according to the terms and conditions of the policy")).  The court interprets the terms

of the policy from the perspective of an "ordinary purchaser of insurance."  *Id*. (quoting

*Congdon v. Berg*, 256 Or. App. 73, 87 (2013)) (quotation marks omitted).  "The language used in

a contract of insurance is entitled to a construction as favorable to the insured as in good

conscience will be permitted, and every reasonable intendment will be allowed to support a view

that will protect the insured and prevent forfeiture."  *Schweigert v. Beneficial Standard Life Ins.*

*Co*., 204 Or. 294, 301 (1955) (citations omitted).

"Whether an insurer has a duty to defend an action against its insured depends on two

documents: the complaint and the insurance policy."  *Ledford v. Gutoski*, 319 Or. 397, 399

(1994) (citing *Oakridge Comm. Ambulance v. U.S. Fidelity*, 278 Or. 21, 24 (1977)).  "If the

allegations in the complaint assert a claim covered by the policy, then the insurer has a duty to

defend.  If the allegations do not assert a claim covered by the policy, then the insurer has no

duty to defend."  *West Hills Dev. Co. v. Chartis Claims, Inc*., 360 Or. 650, 653 (2016) (citations

omitted).  "By limiting the analysis to the complaint and the insurance policy, [this] four-corners

rule generally prevents consideration of extrinsic evidence."  *Id.*  The Oregon Court of Appeals

recognized a narrow exception to this rule in *Fred Shearer & Sons, Inc. v. Gemini Ins. Co.*,

where it considered extrinsic evidence to address the preliminary question whether the party

seeking coverage was an "additional insured" under a policy that defined additional insured by

their relationship to the insured.  237 Or. App. 468, 476-77 (2010), *rev. den.,* 349 Or. 602 (2011).

Oregon law interprets the duty to defend broadly—an insurer has a duty to defend if the

complaint in the underlying lawsuit has "*any basis*" for which the insurer provides coverage.

*Bresee Homes, Inc. v. Farmers Ins. Exch.*, 353 Or. 112, 116 (2012) (quoting *Ledford*, 319 Or. at

399-400) (quotation marks omitted) (emphasis in original).  "[I]f some allegations reasonably

can be interpreted as falling within the coverage, the insurer owes a duty to defend—even if

other allegations of conduct or damage are excluded."  *Shearer*, 237 Or. App. at 478.  The

complaint "need only allege the possibility that [the insured] could be liable" for covered

conduct.  *Sec. Nat'l Ins. Co. v. Sunset Presbyterian Church*, 289 Or. App. 193, 203 (2017).

"Any ambiguity in the complaint with respect to whether the allegations could be covered is

resolved in favor of the insured."  *Ledford*, 319 Or. at 400.  "Regardless of the presence of

ambiguity or unclarity in the complaint, the key question is whether the court can reasonably

interpret the allegations to include an incident or injury that falls within the coverage of the

policy."  *Bresee Homes*, 353 Or. at 117.

"In construing the policy to determine whether it gives rise to a duty to defend, [the

court] construes the text of the policy as a whole, rather than view[ing] particular parts of the

policy in isolation."  *Id.* at 122.  "That principle applies with equal force to the construction of

policy endorsements, exclusions, and exceptions."  *Id.*  The court "may conclude, after

construction of the policy as a whole, that a particular provision nullifies or limits coverage or that one policy provision controls over another.  That conclusion, however, must result from the application of familiar principles of interpretation to the policy as a whole, not from an attempt to give particular weight or effect to one provision because it is an exclusion or exception to the policy's coverage." *Id*.

If an insurance policy explicitly defines a phrase, the court must apply that definition. *Holloway v. Republic Indemn. Co. of America*, 341 Or. 642, 650 (2006).  "If the policy does not define the phrase in question, [the court] 'resort[s] to various aids of interpretation to discern the parties' intended meaning." *Id*. (quoting *Groshong v. Mutual of Enumclaw Ins. Co*., 329 Or. 303, 307-08 (1999)).  "Under that interpretive framework, [the court] first consider[s] whether the phrase in question has a plain meaning, i.e., whether it 'is susceptible to only one plausible interpretation.'" *Id*. (quoting *Groshong*, 329 Or. at 308).  "If the phrase in question has a plain meaning, [the court] will apply that meaning and conduct no further analysis." *Id*.  "If the phrase in question has more than one plausible interpretation, [the court] will proceed to the second interpretive aid—"[t]hat is, [the court] examine[s] the phrase in light of 'the particular context in which that [phrase] is used in the policy and the broader context of the policy as a whole.'" *Id*. (quoting *Hoffman*, 313 Or. at 470) (alteration in original).

"If the ambiguity remains after the court has engaged in those analytical exercises, then 'any reasonable doubt as to the intended meaning of such [a] term[ ] will be resolved against the insurance company. . . .'" *North Pacific Ins. Co. v. Hamilton*, 332 Or. 20, 25 (2001) (quoting, among other cases, *Hoffman*, 313 Or. at 470 (alteration in original)); *see also Allen v. Cont'l Cas. Co.*, 280 Or. 631, 633 (1977) ("[A]lthough an insurance company is ordinarily entitled to the enforcement of an insurance policy as written by the company if its terms are clear and

unambiguous, in the event of an ambiguity in the terms of an insurance policy any reasonable doubt will be resolved against the insurance company and in favor of extending coverage to the insured."). "[A] term is ambiguous . . . *only* if two or more plausible interpretations of that term withstand scrutiny, i.e., continue[ ] to be reasonable . . . ." *Hoffman*, 313 Or. at 470 (emphasis in original).

The general rule in Oregon is that the insured bears the initial burden of proving coverage, the insurer has the burden of proving exclusions to coverage, and the insured has the burden of proving exceptions to exclusions. *Employers Ins. of Wausau, A Mut. Co. v. Tektronix, Inc.*, 211 Or. App. 485, 509, 514 (2007), *rev den,* 343 Or. 363 (2007) (reasoning the party seeking the benefit of a particular provision generally bears the burden of proving its application). However, when an insurance company brings an action for declaratory judgment, it bears the "burden of proving noncoverage." *QBE Ins. Corp. v. Creston Court Condo., Inc*., 58 F. Supp. 3d 1137, 1144 (D. Or. 2014) (citing *United Pacific Insurance Co. v. Mazama Timber Products, Inc.*, 270 Or. 242, 245 (1974)).

## IV.    Insurance Policies

### A.    Great Northern Policies

Great Northern issued three policies to Crown Pine as named insured with effective dates from 2015 to 2018.[2]  The policies' coverage grant provides:

Bodily Injury And Property Damage Liability Coverage

Subject to all of the terms and conditions of this insurance, we will pay damages that the insured becomes legally obligated to pay by reason of liability:
- imposed by law; or

---

[2] Unless otherwise noted, the relevant language from these policies (which all contain the same policy number: Policy No. 3600-83-03-PTL) is materially the same.  *Compare* Michael Decl., Ex. G, ECF 45-7 *with id.*, Ex. H, ECF 45-8 *with id.*, Ex. A, ECF 51-1.  For readability and where appropriate, only citations to the first policy are included.

● assumed in an insured contract;

for bodily injury or property damage caused by an occurrence to which this coverage applies.

This coverage applies only to such bodily injury or property damage that occurs during the policy period.
. . .
Subject to all of the terms and conditions of this insurance, we will have the right and duty to defend the insured against a suit. . . .

Michael Decl., Ex. G, ECF 45-7, at 8-9[3] (emphasis omitted).

The policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," and "property damage" as "physical injury to tangible property, including resulting loss of use of that property" and "loss of use of tangible property that is not physically injured." *Id.* at 34, 36. They define "suit" as "a civil proceeding in which damages . . . are sought," including "an arbitration . . . to which the insured must submit or does submit with our consent." *Id.* at 36. They also provide that the coverage territory "applies anywhere" in which "the insured's responsibility to pay damages . . . is determined in a suit on the merits brought in the United States of America." *Id.* at 10.

### B.    Liberty–Crown Pine Policies

Liberty (as American States) issued four policies to Crown Pine as named insured with effective dates from November 1, 2007, to November 1, 2010, and November 1, 2014, to November 1, 2015.[4]  Their coverage grant provides:

---

[3] Page citations correspond to the page numbers of exhibits where the exhibits have page numbers.  Where the exhibits do not have page numbers, the citations refer to the ECF docket page numbers.

[4] Unless otherwise noted, the relevant language from these policies is materially the same. *Compare* Randy Arthur Decl., Ex. 2, ECF 41-1 (Policy No. 01-CH-688312-1) *with id.*, Ex. 3, (Policy No. 01-CH-688312-2) *with id.*, Ex. 4 (Policy No. 01-CH-688312-3) *with id.*, Ex. 5

Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.
. . .
b. This insurance applies to "bodily injury" and "property damages" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period . . . [.]

Arthur Decl., Ex. 2, at 14, ECF 41-1.

The Liberty–Crown Pine policies further provide the following definitions:

"Coverage territory" means . . . [t]he United States of America (including its territories and possessions), Puerto Rico and Canada . . . [.]

 "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

"Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it . . . [.]

"Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged.  "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent . . . [.]

---

(Policy No. 01-CH-688312-8).  For readability and where appropriate, only citations to the first policy are included.

*Id.* at 26, 28-29.

### C.    Liberty–Campbell Policies

Liberty issued three policies (as American States) to Campbell with effective dates from November 1, 2007, to November 1, 2010, and one policy (as American Economy) to Campbell with an effective date from November 1, 2010, to November 1, 2011.[5]  These policies contain the same provisions as the Liberty–Crown Pine policies.  *See* Arthur Decl., Ex. 6, at 17, 29, 31-32, ECF 41-1.

## V.    Coverage

Great Northern and American States bear the burden of proving there is no coverage under the terms of their policies because they seek a declaratory judgment.  *QBE*, 58 F. Supp. 3d at 114.  As a third-party defendant, American Economy only bears the burden of proving that its policy excludes coverage.  *Employers Ins. Of Wausau*, 221 Or. App. at 509.

Based on the terms of the policies, coverage is established only if: (1) Crown Pine qualifies as an "insured"; (2) Crown Pine asserts a duty to defend against a qualifying "suit"; (3) there was "property damage"; (4) the damage was caused by an "occurrence"; (5) the damage occurred in the "coverage territory"; and (6) the damage occurred during the "policy period." The parties do not dispute whether the alleged damage was in the coverage territory; nor do they argue that the "policy period" element is satisfied.  Liberty Mot. Summ. J. 32, ECF 40 (primarily arguing, in addition to applicable exclusions, that there is no duty to defend because the underlying arbitration is not a "suit" and the counterclaim does not allege an "occurrence" or any

---

[5] Unless otherwise noted, the relevant language from these policies is materially the same. *Compare* Arthur Decl., Ex. 6, ECF 41-1 (Policy No. 01-CH-660085-20) *with id.*, Ex. 7 (Policy No. 01-CH-660085-30) *with id.*, Ex. 8 (Policy No. 01-CH-660085-40) *with id.*, Ex. 9 (Policy No. 01-CH-660085-5).  For readability and where appropriate, only citations to the first policy are included.

"property damage"); Great Northern Mot. Summ. J. 12, ECF 44 (arguing, in addition to applicable exclusions, that there is no duty to defend because the counterclaim does not allege an "occurrence" or "property damage").  Thus, only the first four issues are addressed before turning to policy exclusions.

### A.    Insured Status

For the reasons explained below, Crown Pine is an insured under the Great Northern and Liberty–Crown Pine policies but not the Liberty–Campbell policies.

#### 1.    Great Northern and Liberty–Crown Pine Policies

The Great Northern policies expressly list "Crown Pine Timber 4, L.P." as an insured. Michael Decl., Ex. G, ECF 45-7, at 38; *id.*, Ex. H, ECF 45-8, at 38; David Rossmiller Decl. ("Rossmiller Decl."), Ex. 1, ECF 54-1, at 1.  Although the Liberty–Crown Pine policies list only "Crown Pine Holdings, L.P." as the named insured, Arthur Decl., Ex. 2, at 1, ECF 41-1; *id.*, Ex. 3, at 1; *id.*, Ex. 4, at 1; *id.*, Ex. 5, at 1, Liberty concedes "'Crown Pine Timber 4, L.P.' was listed as a named insured on the Crown Pine Policies."  Liberty Mot. Summ. J. 6, ECF 40.  Thus, there is no triable issue of fact that Crown Pine is an "insured" under either the Great Northern policies or the Liberty–Crown Pine policies.

#### 2.    Liberty–Campbell Policies

Generally, the Liberty–Campbell policies only provide coverage to insureds; however, they contain an Additional Insured Primary Coverage endorsement ("AI endorsement") that states "who is insured is amended to include" additional insureds "subject to" certain "provisions."   Arthur Decl., Ex. 6, at 16, ECF 41-1.

Crown Pine is listed as an "additional insured" on the policies issued by American States. *Id.*, Ex. 6, at 2; *id.*, Ex. 7, at 2; *id.*, Ex. 8, at 15.  And although the policy issued by American

Economy lists only "Crown Pine Holdings, L.P.," "Crown Pine Parent, L.P.," and "Crown Pine Timber 1, L.P.," *id.*, Ex. 9, at 2, Liberty concedes Crown Pine is listed as an additional insured under that policy as well.  Liberty Mot. Summ. J. 25, ECF 40.  Liberty also raised no objection during oral argument to Crown Pine's assertion that it was listed as an additional insured under the policy issued by American Economy.

It is thus undisputed that Crown Pine is an additional insured under the Liberty–Campbell policies.  The question, then, is whether Crown Pine meets the "provisions" of the AI endorsement to qualify as an insured.

### a.    Extrinsic Evidence: Four-Corners Rule and *Shearer* Exception

Crown Pine offers the following evidence outside the four corners of the counterclaim and the insurance policies to make this showing: the declaration testimony of Campbell's general counsel (ECF 43), various iterations of the Agency Agreement between Crown Pine and Campbell (ECF 43-3), and a Professional Services Agreement between Campbell, as Crown Pine's agent, and Raven Environmental Services (ECF 43-4).  However, this evidence does not fall within what Oregon courts have defined as a narrow exception to the four-corners rule.

The Oregon Court of Appeals has twice approved the use of evidence outside the four corners of an insurance policy to determine whether an entity qualifies as an insured, in *Shearer*, 237 Or. App. at 471, and *West Hills Development Co. v. Chartis Claims, Inc.*, 273 Or. App. 155, 163 (2015), *aff'd sub nom.*, *West Hills Development Co. v. Chartis Claims, Inc. Oregon Auto. Ins. Co.,* 360 Or. 650 (2016).  However, in *West Hills*, the Oregon Supreme Court distinguished *Shearer* and decided whether the plaintiff was an "insured" without looking to extrinsic evidence.  360 Or. at 654, 659-60, 666.  The Oregon Court of Appeals followed suit in *PIH Beaverton LLC v. Red Shield Ins. Co.*, confirming the *Shearer* exception is narrow and limited to

determining whether the entity tendering the complaint for defense is an additional insured—
when qualifying as an additional insured is contingent on membership in an open class. 289 Or.
App. 788, 799 (2018).

 The policies in *PIH Beaverton* and *Shearer* did not list the additional insureds by name,
as the policies in this case and *West Hills* do. Instead, they created an open class of additional
insureds defined by the unidentified class member's relationship to the named insured. *See PIH
Beaverton*, 289 Or. App. at 799 (providing that "any person or organization for whom
[Thompson is] performing operations when [Thompson] and such person or organization have
agreed in writing in a contract or agreement that such person or organization be added as an
additional insured on [Thompson's] policy") (alterations in original); *Shearer*, 237 Or. App. at
474 (providing that "any person or organization . . . that distributes or sells [the insured's]
products in the regular course of that person or organization's business" was an additional
insured) (original alterations omitted).

 *Shearer* used extrinsic evidence to determine whether the entity tendering the complaint
for defense was a member of the open class. 237 Or. App. at 476-78. In *West Hills*, the Oregon
Supreme Court at least implicitly acknowledged the necessity of considering such evidence
because without it, "[a]n insurer who received a tender of defense from a person or organization
purportedly in this open class as alleged additional insured, unknown to the insurer and unnamed
on the policy, would have no way to know whether the alleged additional insured had any
relationship to the insurance contract at all." 360 Or. at 666. The Oregon Supreme Court
declined to decide whether *Shearer* was "correctly decided," but found it "distinguishable" by
the fact that, as here, the policy designated the additional insured by name. *Id.* The policy
condition at issue did "not relate to whether West Hills was an additional insured." *Id.* "Instead,

any facts pertinent to that condition have to do with the particular claims against West Hills that [the insurer] agreed to cover," and "[b]y nature, such facts are indistinguishable from facts pertaining to any other limitation on coverage that might be found in the policy." *Id.* at 666-67. A "dispute with respect to those facts" had to be resolved "based on the familiar principle" whether the "complaint's allegations, reasonably interpreted, could result in West Hills being held liable for damages under the policy," i.e., "[u]nder the four-corners rule." *Id.*

Even in *PIH Beaverton*, where "additional insured" was defined by an open class, the Oregon Court of Appeals declined to resort to extrinsic evidence because the insurer did not dispute the claimant's identity as an additional insured. 289 Or. App. at 799. The *PIH Beaverton* court found that because the parties' dispute concerned "a condition found in the additional-insured endorsements to the policies," the exception to the four-corners rule did not apply. *Id.*

Here, there is no open class of additional insureds, and it is undisputed that Crown Pine is named as an additional insured. As in *West Hills* and *PIH Beaverton*, the dispute concerns whether policy provisions limit Crown Pine from coverage, which is limited by the four-corners rule. Crown Pine's extrinsic evidence therefore cannot be considered.

   **b.**  **AI Endorsement**

The AI endorsement of the Liberty–Campbell policies provides that an insured is "amended to include" an additional insured:

> [O]nly for liability directly resulting from:
>  a. your ongoing operations for the additional insured whether the work is performed by you or for you; or
>  b. the general supervision of your ongoing operations by the additional insured.

Arthur Decl., Ex. 6, at 16, ECF 41-1.  Otherwise stated, Crown Pine is included as an insured

under the policies when there is liability directly resulting from (1) Campbell's ongoing

operations for Crown Pine, whether the work is performed by Campbell or for Campbell, or (2)

Crown Pine's general supervision of Campbell's ongoing operations.

Crown Pine argues the arbitration counterclaim reasonably implies that Crown Pine was

not working alone, even though Campbell is not named.  Crown Pine Mot. Summ. J. 18, ECF 39.

Crown Pine's logic is as follows: All the allegations in the counterclaim relate to its management

of Crosby's timberlands; the allegations make clear that Crown Pine not only manages Crosby's

timberlands, but also its own timberland in other states; it is reasonable to conclude that to

manage such a "huge area of land," Crown Pine likely employed the help of a management

company, like Campbell, to perform the work on the ground that Crosby contends is faulty; and

the counterclaim reasonably could be interpreted to result in Crown Pine being held liable for the

work Campbell performed.  *Id*.

Liberty avers, speculation and conjecture aside, the counterclaim only alleges fault by

Crown Pine and does not even allude to or imply the existence of a third party.  Liberty Mot.

Summ. J. 26-30, ECF 40; Liberty Resp. 21-26, ECF 49; Liberty Reply 18-23, ECF 55.  Liberty

contends that courts that have addressed the issue have looked to "specific allegations in the

complaint from which it can reasonably be concluded that the Additional Insured's liability is

alleged to have arisen out of actions of the Named Insured."  Liberty Mot. Summ. J. 28, ECF 40.

Indeed, courts have found an additional insured qualifies as an insured under similar AI

endorsements by relying on allegations that refer to entities or people by their roles—but not by

name.  *E.g.*, *West Hills*, 360 Or. at 657 (alleging West Hills had hired and supervised

subcontractors and had been negligent in "[f]ailing to properly . . . oversee, inspect, and

supervise . . . *subcontractors*" and "[f]ailing to notify . . . *subcontractors* . . . of improper

construction means and methods") (emphasis added); *PIH Beaverton*, 289 Or. App. at 801

(alleging fault by "subcontractor"); *Hoffman Const. Co. of Oregon v. Travelers Indem. Ins. Co.*,

CIV. 05-456-AA, 2005 WL 3689487, at *4 (D. Or. Nov. 28, 2005) (alleging the presence of

unknown John Doe defendants and holding it is enough that a "complaint raised by implication

the possibility that the nonparty named insured might have been at fault in a way that triggered

coverage under the additional insured endorsement"). These outcomes align with the Oregon

Supreme Court's instruction that what matters is "whether the *facts alleged* in the complaint"

may reasonably be interpreted to include covered conduct. *West Hills*, 360 Or. at 663-64

(emphasis added) (quoting *Ledford*, 319 Or. at 400).

       In *Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co.*, the court found a similar AI

endorsement was triggered where the complaint alleged the injured party was given an

instruction, but not by whom. 112 F. Supp. 3d 1160, 1166 (D. Or. 2015) (hereinafter "*PGE*").

Although the allegation did not identify the entity or person who gave the instruction, "all of the

allegations . . . when read together" indicated the instruction contributed to the injury. *Id.* at

1167. Passive voice and ambiguity notwithstanding, the court found the complaint implicitly

alleged the insured may have given the instruction and thus may have born some fault for the

injury, triggering the coverage of the AI endorsement. *Id.*

       The inference that Crown Pine must have agents to do the work because the lease covers

such a large territory is simply not based on the factual allegations. Unlike *West Hills*, *PIH*

*Beaverton*, and *Hoffman Construction*, Crosby's "Response to Demand for Arbitration and

Counterclaim" does not refer to any other entities or people, even by their roles. And unlike

*PGE*, it does not even allude to the existence of a third party. Rather, Crosby's allegations are

like those in cases where the court held that the additional insured is the sole entity responsible

for the injury.  *E.g.*, *Clarendon Nat'l Ins. Co. v. Am. States Ins. Co.*, 688 F. Supp. 2d 1186, 1192

(D. Or. 2010) ("allegations expressly assign 'sole' responsibility to [additional insured]");

*Richardson v. Howard S. Wright Constr. Co.*, No. 3:05-cv-01419-ST, 2007 WL 1467411, at *8

(D. Or. May 18, 2007) ("the allegations point only to [the additional insured] as the party

'completely and solely responsible' for the staging that caused [the] injuries").

      Crown Pine argues the counterclaim reproduces provisions of the lease obligating Crown

Pine to "operate and manage" said timberlands and refers to Crown Pine's "management

practices" and "management program."  Rossmiller Decl., Ex. 1, at 11-13 ECF 42-1.  But these

uses of "manage" and "management" do not imply the existence of any third party.  *See Manage*,

MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/manage (last visited

December 14, 2020) ("to handle or direct with a degree of skill: such as to exercise executive,

administrative, and supervisory direction of"); *Management*, MERRIAM-WEBSTER,

https://www.merriam-webster.com/dictionary/management (last visited December 14, 2020)

("the act or art of managing: the conducting or supervising of something (such as a business)").

Managing timberlands necessitates the existence of timberlands, not an agent.

      In sum, Crown Pine is an insured under the Great Northern and Liberty–Crown Pine

policies but not under the Liberty–Campbell policies.  Liberty has no duty to defend under the

Liberty–Campbell policies.  Liberty's arguments regarding the AI endorsement's exclusions

need not be reached.

### B.      Qualifying Suit

The Great Northern and Liberty–Crown Pine policies define "suit" as a civil proceeding in which damages are sought, including "an arbitration . . . to which the insured must submit or does submit with our consent." *See supra* Sect. IV(A), (B).

Crown Pine relies on pre-arbitration litigation documents referenced in Crosby's response to the demand for arbitration to support its position that the underlying arbitration was one to which it "must submit." These documents include the petition for specific performance filed by Crosby in Louisiana state court (ECF 59-1), the lease agreement between Crown Pine and Crosby (ECF 59-1, at 8), and the Louisiana state court's order granting Crown Pine's motion to compel arbitration (ECF 43-5). Crown Pine invokes *United States v. Ritchie*, for the proposition that "[e]ven if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" 342 F.3d 903, 907-08 (9th Cir. 2003).

Federal courts employ this "incorporation by reference" doctrine, and otherwise take judicial notice of authentic documents and documents attached to the complaint, to resolve Rule 12(b)(6) motions to dismiss without converting them into Rule 56(b) motions for summary judgment. *Id.* at 908. These doctrines have no bearing on Oregon's four-corners rule. *See Ledford*, 319 Or. at 399 ("Whether an insurer has a duty to defend an action against its insured depends on two documents: the complaint and the insurance policy."); *West Hills*, 360 Or. at 653 ("By limiting the analysis to the complaint and the insurance policy, the four-corners rule generally prevents consideration of extrinsic evidence."). Crown Pine's evidence again violates the four-corners rule and cannot be considered.

Turning to the merits, it is undisputed that Crown Point submitted to the arbitration but that the insurers, Liberty and Great Northern,[6] did not consent to it. Thus, the issue is whether the arbitration is a proceeding to which Crown Pine "must submit." "Must" means to be commanded, compelled, obliged, or required. *Must, MERRIAM-WEBSTER*, https://www. merriam-webster.com /dictionary/must (last visited December 14, 2020). It denotes necessity and obligation. "Submit" means "to yield to governance or authority." *Submit, MERRIAM-WEBSTER*, https://www.merriam-webster.com/dictionary/submit (last visited December 14, 2020). By these definitions, the arbitration is a suit if Crown Pine was commanded, compelled, obliged, or required to yield to it by some authority.

Liberty asserts the arbitration is not a suit because Crown Pine moved to compel arbitration and "no court required Crown Pine to initiate" the arbitration. Liberty Reply 17, ECF 55. However, when Crosby asserted its counterclaim, Crown Pine had been commanded, compelled, obliged, or required to yield to the authority of the state court order commanding the parties to arbitrate—which originated from a proceeding Crown Pine did not initiate. The arbitration is therefore a suit under the policies for the purpose of the insurers' duty to defend.

### C.    Property Damage

The Great Northern and Liberty–Crown Pine policies define "property damage" as "physical injury to tangible property," including "resulting loss of use of that property[,]" and

---

[6] Great Northern did not brief this issue. Crown Pine argues the insurers' positions are inconsistent because Great Northern is silent on the question whether the underlying arbitration is a suit, and that this inconsistency is evidence that "the allegations could be reasonably interpreted to meet the requirement." Crown Pine Resp. 23, ECF 52. However, Great Northern's counsel represented during oral argument that he simply did not think of this issue at the time, and moved to join Liberty's argument. Great Northern's oral motion to join is granted because the omission was inadvertent. Thus, there is no inconsistency between the insurers' positions on this issue.

"loss of use of tangible property that is not physically injured." *See supra* Sect. IV(A), (B).

"Injury" is not defined by the policies. However, the plain meaning of "injure" is to "inflict

material damage or loss on." *Injury, MERRIAM-WEBSTER*, https://www.merriam-

webster.com/dictionary/injure (last visited December 14, 2020). Where a term is not defined in

the policy and has a plain meaning, the court "will apply that meaning and conduct no further

analysis." *Holloway*, 341 Or. at 650.

Great Northern argues the counterclaim contains "no express allegations of . . . breaches

causing 'physical injury' to Crosby's 'tangible property[,]'" but only "alleges violation of

industry standards/best practices, laws and regulations that are 'directed to maximizing the value

of Crosby's forests.'" Great Northern Mot. Summ. J. 19, ECF 44. *Id.* (quoting Rossmiller Decl.,

Ex. 1 (Counterclaim ¶¶ 8-9), ECF 42-1). According to Great Northern, "this implicates nothing

more than an economic loss arising from the breach of the Lease," and that, on its own, "[t]he

fact that Crown [Pine] was required to maintain the land and ultimately return it to Crosby in a

manner that maintains the economic value of the land and trees thereon does not render the

allegations 'property damage.'" *Id.* at 19-20. Liberty does not contest this element of coverage.

*See* Liberty Mot. Summ. J. 17-23, ECF 40. Crown Pine acknowledges that although the

counterclaim alleges economic loss arising from breach of the lease, it also contains several

allegations that meet the first definition of property damage. Crown Pine Mot. Summ. J. 22-24,

ECF 39.

The counterclaim alleges Crown Pine "prematurely harvested and otherwise mismanaged

Crosby's leased land in breach of industry standards and in breach of the Agreement."

Rossmiller Decl., Ex.1 (Counterclaim ¶ 11), ECF 42-1. Those industry standards include

"among other management practices, Louisiana Best Management Practices, laws and

regulations related to clean water and endangered species protection, and silvicultural and property protection practices directed to maximizing the value of Crosby's forest." *Id.* (Counterclaim ¶¶ 8-9). Then, the counterclaim alleges Crown Pine

> breached the Agreement, as amended, in [its] (a) cutting or harvesting of trees; (b) merchandising of wood products; (c) site preparation for planting of trees; (d) selection of trees for planting; (e) planting of trees; (f) stocking levels; (g) post establishment releases/treatments; (h) payment for severed wood; (i) control of invasive species; (j) endangered species legal and regulatory compliance; (k) establishment and maintenance of boundary lines; (1) maintenance of roads and fire lines; (m) protection of creeks, streams, waterways and wetlands; and (n) control of soil erosion. As a proximate result, Crosby has been damaged.

*Id.* (Counterclaim ¶ 16).

Crown Pine elaborated during oral argument how each of the allegations in the last half of paragraph 16 could constitute physical injury to tangible property: Crown Pine's mismanagement of invasive species could lead to an abundance of unwanted species that damage desirable species and inhibit their growth; its mismanagement of road maintenance could lead to divots or the washing out of the roads; its mismanagement of fire lines, which is an area that has been dug out, could lead to large gullies; its mismanagement of boundary lines could lead to the degradation of a fence; its mismanagement of creeks, streams, waterways, and wetlands could have damaged them, their embankments, and downstream land or waterways; and its mismanagement of soil erosion could materially damage both the landscape being eroded and the waterways capturing the erosion. Taken together with the allegations that Crown Pine "mismanaged Crosby's leased land in breach of industry standards" and that such industry standards "require Crown [Pine] to observe, among other management practices . . . laws and regulations related to *clean water and endangered species protection, and silvicultural and property protection practices*," along with the claim that "Crosby has been damaged," *id.* (Counterclaim ¶¶ 8-9, 11, 16) (emphasis added), the allegations constitute "property damage."

The fact that Crosby did not expressly state how it was damaged—either by loss in value of the land (i.e., economic loss) or by physical injury to the land (i.e., property damage)—does not preclude a finding that there was physical injury to tangible property. *See Marleau v. Truck Ins. Exch.*, 333 Or. 82, 89 (2001) (holding it is enough that the complaint alleges facts that "without amendment, may impose liability for conduct covered by the policy"). "[N]either the failure to identify correctly the claims nor the failure to state them separately defeats the duty to defend." *Id.* at 91. Rather, these allegations, reasonably interpreted, *could* result in Crown Pine being held liable for material damage to Crosby's leased land. That the allegations also support an interpretation implicating loss in economic value and defective workmanship is not controlling. *See id.*; *West Hills*, 360 Or. at 665 (rejecting the insurer's "assertion that there is no duty to defend unless the complaint 'rules in' coverage"); *see also Sec. Nat'l Ins. Co.*, 289 Or. App. at 203 ("[F]or purposes of the duty to defend, the complaint need only allege the possibility that [the insured] could be liable for damage from defective work.").

Great Northern argues the allegations should be put into their temporal context: Crown Pine has an obligation to maintain the economic value of the property during the term of the lease, and the lease has yet to run. Although this line of reasoning may be relevant to an exclusion covering ongoing operations, whether Crown Pine can still fix a physical injury to tangible property does not mean Crosby has not alleged physical injury to tangible property. The counterclaim sufficiently alleges property damage.

### D.    Occurrence

Both the Great Northern and Liberty policies require that property damage be "caused by an occurrence," and define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *See supra* Sect. IV(A), (B).

"Accident" is undefined by the policies, but its meaning "is well established and unambiguous." *Drake v. Mut. of Enumclaw Ins. Co.*, 167 Or. App. 475, 481 (2000). The meaning of "accident" does not focus on the intentionality of the insured's conduct; rather, it looks to whether the insured "intended to cause injury." *Id.* If the injury was intentionally inflicted, it was not the result of an accident and, accordingly, did not arise from an occurrence. *Id.* "[T]he question is whether 'the insured intended to cause the particular injury or harm, as opposed to merely intending the act.'" *ZRZ Realty Co. v. Beneficial Fire & Cas. Ins. Co.*, 222 Or. App. 453, 469 (2008) (quoting *Ledford*, 319 Or. at 401).

Under Oregon law, "there can be no 'accident,' within the meaning of a commercial liability policy, when the resulting damage is merely a breach of contract." *Oak Crest Const. Co. v. Austin Mut. Ins. Co.*, 329 Or. 620, 626 (2000). However, "the same conduct might be actionable under both tort and contract theories." *Id.* at 628. "[I]n some circumstances, property damage that results from the negligent performance of a contract can qualify as being 'caused by accident.'" *Id.* at 627. "But . . . 'accident' has a tortious connotation' and exists only when damage results, in some sense, from a tort, i.e., a breach of some duty imposed by law." *Id.* (quoting *Kisle v. St. Paul Fire & Marine Ins.*, 262 Or. 1, 7 (1972)).

"[T]he pivotal question . . . is whether the allegedly negligent party is subject to a standard of care independent of the terms of the contract." *Georgetown Realty, Inc. v. Home Ins. Co.*, 313 Or. 97, 110 (1992). A standard of care "could be 'independent' of the contract either because a 'special relationship' imposes a heightened standard of care . . . or because common law, statutes, or administrative rules impose liability regardless of the contractual relationship between the parties." *Abraham v. T. Henry Const., Inc.*, 350 Or. 29, 40 (2011); *Vail v. Country Mut. Ins. Co.*, No. 2:13-cv-02029-SI, 2015 WL 6123770, at *1 (D. Or. Oct 16, 2015) (so stating).

Importantly, determining whether there is a duty to defend is not constrained by whether a tort claim is pleaded in the underlying action. The court "consider[s] the substance of the underlying complaint" and "construe[s] the allegations as potentially providing notice to the insurer" of a tort claim, "even though no such claim was specifically identified in the underlying complaint." *Wausau Bus. Ins. Co. v. Boyd Coffee Co.*, No. 3:12-CV-0968-HU, 2014 WL 897115, at *2 (D. Or. Mar. 3, 2014). Otherwise stated, "reliance on the labels placed on counts in a complaint alone is not sufficient to determine the duty to defend. . . . Rather, it is the "conduct" alleged that is critical to the determination." *L & D of Oregon, Inc. v. Am. States Ins. Co.*, 171 Or. App. 17, 20 (2000); *see also Willmar Dev., LLC v. Illinois Nat. Ins. Co.*, 726 F. Supp. 2d 1280, 1283-84 (D. Or. 2010), *aff'd*, 464 F. App'x 594 (9th Cir. 2011) ("An insurer's duty to defend is a question of law and is determined by comparing the policy's terms with the facts in the complaint.") (citing *Marleau*, 155 Or. App. at 152); *Naumes, Inc. v. Chubb Custom Ins. Co.*, No. CIV.05-1327-HA, 2007 WL 54782, at *4 (D. Or. Jan. 5, 2007) (recognizing the "nature of the damage alleged controls coverage").

Here, Crosby's counterclaim expressly alleges a single claim for "Breach of Agreement," a contract. Crown Pine asserts that, in addition to a breach of contract claim, the counterclaim also "state[s] allegations that would allow Crosby to bring tort claims against Crown Pine for Crown Pine's alleged breaches of industry standards, including laws and regulations, that allegedly harmed Crosby." Crown Pine Mot. Summ. J. 26, ECF 39; Crown Pine Reply 9, ECF 57; *see Abraham*, 350 Or. at 40.

Great Northern argues that under *Georgetown*, "the remedy for a negligent breach of contract remains under contract (not tort) law." Great Northern Reply 4, ECF 56. It relies on the following passage from *Georgetown*:

> When the relationship involved is between contracting parties, and the gravamen of the complaint is that one party caused damage to the other by negligently performing its obligations under the contract, then, and even though the relationship between the parties arises out of the contract, the injured party may bring a claim for negligence if the other party is subject to a standard of care independent of the terms of the contract. If the plaintiff's claim is based solely on a breach of a provision in the contract, which itself spells out the party's obligation, then the remedy normally will be only in contract, with contract measures of damages and contract statutes of limitation. That is so whether the breach of contract was negligent, intentional, or otherwise. In some situations, a party may be able to rely on either a contract theory or a tort theory or both.

313 Or. at 106. Great Northern also cites the Oregon Court of Appeals' decision in *Abraham*, which states that "[f]or the injured party to have a tort claim, . . . that party must allege the breach of a standard of care that is independent of the contract and without reference to its specific terms." Great Northern Reply 5, ECF 56 (quoting *Abraham v. T. Henry Const., Inc.*, 230 Or. App. 564, 568 (2009)).

However, the Oregon Court of Appeals' decision in *Abraham* was superseded by the Oregon Supreme Court's decision, which clarified the exact language from *Georgetown* upon which Great Northern relies:

> *Georgetown*'s general statements about the intersection of contract and tort claims, quoted above, do not turn on whether a special relationship exists, but rather require only a standard of care that is independent of the terms of the contract. . . That standard could be "independent" of the contract either because a "special relationship" imposes a heightened standard of care (as in *Georgetown*) or because the common law, statutes, or administrative rules impose liability regardless of the contractual relationship between the parties.

*Abraham*, 350 Or. 39-40. The Oregon Supreme Court went on to hold:

> *Georgetown* and earlier cases support the conclusion that common law negligence principles apply—notwithstanding a contractual relationship—as long as the property damage for which the plaintiff seeks recovery was a reasonably foreseeable result of the defendant's conduct. Thus, a negligence claim for personal injury or property damage that would exist in the absence of a contract will continue to exist *unless* the parties define their respective obligations and remedies in the contract to limit or foreclose such a claim. Parties may limit tort remedies by defining their obligations in such a way that the common law

standard of care has been supplanted, *see* [*Fazzolari By & Through Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or 1, 17 (1987)] (so stating), or, in some circumstances, by contractually limiting or specifying available remedies.

*Id.* The Oregon Supreme Court further emphasized that "[n]othing in this court's cases suggests that, by entering into a contract, a party necessarily waives tort claims against another party to the contract." *Id.* at 38; *see*, *e.g.*, *Olson v. Pac. Nw. Bell Tel. Co.*, 65 Or. App. 422, 425 (1983) (holding that where telephone utility company "failed to perform its statutory duty, plaintiff may recover under negligence, gross negligence or breach of contract theories.").

Here, the counterclaim alleges that Crown Pine "mismanaged Crosby's leased land in breach of industry standards *and* in breach of the Agreement." Rossmiller Decl., Ex. 1 (Counterclaim ¶ 11), ECF 42-1 (emphasis added). The counterclaim contains no indication that Crosby and Crown Pine defined their obligations and remedies to foreclose a negligence claim outside the contract or contractually limited their available remedies to breach of contract. Thus, the counterclaim alleges the "possibility that [Crown Pine] could be liable" for covered conduct. *Sec. Nat'l Ins.*, 289 Or. App. at 203. Moreover, to the extent there is "[a]ny ambiguity in the [counterclaim] with respect to whether the allegations could be covered," it must be "resolved in favor of the insured." *Ledford*, 319 Or. at 400.

Great Northern argues that the Louisiana best practices are mere "guidelines" that "do not create a basis for liability outside the parameters of the Lease itself," and that "passing references" to laws and regulations "does not suggest or allege liability arising out of any particular statute." Great Northern Mot. Summ. J. 18, ECF 44. Indeed, the counterclaim speaks about industry standards, laws, and regulations in more general terms. Nevertheless, the allegations "could impose liability for conduct covered by the policy." *Ledford*, 319 Or. at 400. And the counterclaim's reference to "laws and regulations related to clean water" is sufficient to,

at a minimum, invoke standards under the Clean Water Act, 33 U.S.C. § 1365(a), which Crown Pine must comply with regardless of its contractual obligations under the lease.[7]  *See Pulte Home v. Simerly*, 322 Ga. App. 699, 706 (2013) (upholding "negligence per se" claim based on violation of the Clean Water Act).  "[I]n the absence of any compelling evidence of no coverage, the insurer owes a duty to defend if the injured claimant can recover under the allegations of the complaint upon any basis for which the insurer affords coverage."[8]  *Casey v. Nw. Sec. Ins. Co.*, 260 Or. 485, 489 (1971).

Great Northern contends that for there to be a negligence action independent of the contract, Crosby needed to seek recovery under a statute that provides a private right of action against Crown Pine.  Great Northern Resp. 12, ECF 50.  On the contrary, there is no requirement that the industry standard, statute, or regulation must provide a private right of action to serve as the basis of a standard of care independent of a contract.  Outside sources of law such as "industry standards, statutes, or regulations could, in a particular case, provide a basis in law for liability" in a negligence action.  *Boyer v. Salomon Smith Barney*, 344 Or. 583, 595 (2008); *see also Abraham*, 350 Or. at 41 (recognizing "tort claim for property damage to the house caused by the leaking pipes if the homeowner could prove that the contractor's failure to meet the standard of care caused the property damage").

---

[7] Crosby alleged Crown Pine failed to protect its creeks, streams, waterways, and wetlands. Rossmiller Decl., Ex. 1 (Counterclaim ¶ 16), ECF 42-1.

[8] Liberty also argues Crown Pine "exercised its business judgment and decided not to maintain roads, or not to control invasive species, or not to plant trees or maintain boundary lines, etc." and "[t]hese are not activities that can be 'accidental,' but are stereotypical examples of business choices."  Liberty Resp. 13, ECF 49.  But again, Crosby's allegations include that Crown Pine "prematurely harvested and otherwise mismanaged Crosby's leased land *in breach of industry standards and* in breach of the Agreement."  Rossmiller Decl., Ex. 1 (Counterclaim ¶ 11), ECF 42-1 (emphasis added).

Great Northern relies on *Foraker v. USAA Cas. Ins. Co.*, No. 3:14-cv-0087-SI, 2017 WL 3184716 (D. Or. July 26, 2017), a well-reasoned opinion from this district, in support of this argument.  Great Northern Mot. Summ. J. 19, ECF 44; Great Northern Reply 6, ECF 56. However, Great Northern misconstrues *Foraker*, which held that an insured could not assert a negligence per se claim against its first-party insurer premised on Oregon statutes prohibiting unfair claims settlement practices (except in limited circumstances not present there).  2017 WL 3184716 *7 (citing O.R.S. 746.230).  In that context—where Oregon law prohibits tort actions against first-party insurers arising from breach of the insurance contract and O.R.S. 746.230 provides for no private right of action—the insured could not "attempt to combine these prohibited causes of action into a hybrid negligence per se claim."  *Clymo v. Am. States Ins. Co.*, No. 2:18-cv-00168-SU, 2018 WL 4092022, at *3, *3 n.3 (D. Or. June 7, 2018), *report and recommendation adopted,* No. 2:18-cv-0168-SU, 2018 WL 3752857 (D. Or. Aug. 8, 2018) (discussing *Foraker* in the same first-party insurance context).  By contrast, here, the question is whether the allegations in Crosby's counterclaim can be reasonably interpreted to state a claim for common-law negligence against Crown Pine, not its first-party insurance provider.  In fact, *Foraker* specifically acknowledged *Abraham*'s holding outside of the first-party insurance context—that "there is no requirement that the violated statute (or rule) provide for a private cause of action to remedy its breach."  2017 WL 3184716, at *6 (citation omitted).

The insurers' reliance on *H.D.D. Co., Inc. v. Navigators Specialty Ins. Co.*, 401 F. Supp. 3d 1176 (D. Or. 2019), *appeal dismissed,* No. 19-35666, 2020 WL 529803 (9th Cir. Jan 24, 2020), is also misplaced.  There, the demand for arbitration alleged the insured, a construction subcontractor, "failed to perform work" under a change order, engaged in delays, missed a deadline, and used inadequate product.  *Id.* at 1182.  The demand asserted that, "[a]s a result of

[the insured's] delays, defective work and erroneous material selection, [the insured] failed to complete the work on time as promised" and thereby breached the agreement. *Id.* The court held that, under *Oak Crest*, the insured's breach of its contractual obligation was not an "occurrence" within the meaning of the policy.[9] *Id.* at 1182-83. Here, the allegations allege more than nonperformance of the lease. The counterclaim alleges that Crown Pine "mismanaged Crosby's leased land in breach of industry standards *and* in breach of the Agreement." Rossmiller Decl., Ex. 1 (Counterclaim ¶ 11), ECF 42-1 (emphasis added).

Finally, Liberty and Great Northern's reliance on *Campbell Glob., LLC v. Am. Econ. Ins. Co.*, for its "occurrence" analysis is misplaced because that is a duty-to-indemnify case. 2017 WL 3749767, at *1. Liberty and Great Northern acknowledge that the analysis for the duty to indemnify differs from the analysis for the duty to defend. Liberty Mot. Summ. J. 17, ECF 40; Great Northern Reply 10, ECF 56. Still, Liberty argues the *Campbell* "court's conclusion that the claims against the insured resulted only in breach of contract damages, even though both contract and negligence claims were asserted against Campbell, supports the conclusion that no 'occurrence' is alleged in the Crosby Counterclaim and no duty to defend is owed." Liberty Mot. Summ. J. 17, ECF 40; *see also* Great Northern Resp. 6-7, ECF 50 (discussing the arbitrator's findings in *Campbell* and comparing those findings to the allegations in the counterclaim here).

However, construing the court's holding in *Campbell* as Liberty and Great Northern do would effectively raise the standard for duty to defend cases. Under Oregon law, the duty to

---

[9] The court also held the complaint did not allege property damage, meaning physical injury to tangible property, because the allegations could not be reasonably interpreted to allege damage to anything other than defects in the workmanship. *H.D.D.*, 401 F. Supp. 3d at 1183. Here, the counterclaim can be reasonably interpreted to allege damage to tangible property other than Crown Pine's defective workmanship.

defend is broad, and "is triggered anytime there is a *possibility* an insurer could be liable to indemnify the insured. *Fireman's Fund Ins. Co. v. Ed Niemi Oil Co., Inc.*, No. CV03-25-MO, 2006 WL 8446572, at *2 (D. Or. Jan. 20, 2006) (emphasis in original).  The ruling in *Campbell* does nothing to alter this standard.  Rather, the *Campbell* court looked to the findings of the arbitrators, as opposed to the allegations in the underlying complaint, and found "[t]here [was] not any indication in those findings that the arbitrators were making findings as to the elements of the [claimants'] negligence claim and, in particular, there is not any indication that the arbitrators found that [Campbell Global] owed and violated any duty imposed by law apart from the lease."  2017 WL 3749767, at *5; *see also Campbell Glob., LLC v. Am. States Ins. Co.*, 784 F. App'x 543, 544 (9th Cir. 2019) (affirming the district court's findings on appeal, the Ninth Circuit added that there was no "occurrence" or accident in that matter because the "arbitration award contained the finding that Campbell . . . acted deliberately and in bad faith").[10]

Having established the duty element of a negligence claim, in the form of standards of care independent of the contract in industry standards, statutes, and regulations, it suffices to note that the allegations clearly support the remaining elements of a common-law negligence claim.[11]  Therefore, the counterclaim can reasonably be construed to allege an occurrence.

## VI.   Exclusions

"Whether an exclusion in an insurance policy relieves an insurer of its duty to defend the insured will depend on the meaning of the exclusion and whether, properly construed, it

[10] It is worth noting that the *Campbell* insurers had owed a duty to defend because the complaint alleged negligence even though, ultimately, there was no duty to indemnify on that basis.  2017 WL 3749767, at *1.

[11] The parties also discuss whether a special relationship exists.  It is unnecessary to reach that issue.

31 – OPINION AND ORDER

encompasses all of the allegations made in the complaint that would otherwise give rise to that duty." *Bighorn Logging Corp. v. Truck Ins. Exch.*, 295 Or. App. 819, 828 (2019). Exclusions are interpreted like any other terms in the policy, i.e., from the perspective of an ordinary purchaser of insurance, applying plain meaning to terms not defined in the policy, and resolving ambiguities regarding the meaning of terms in favor of the insured. *Id.* at 828-29.

### A.    Great Northern's Exclusions

The Great Northern policies contain various "Bodily Injury/Property Damage Exclusions." *See* Michael Decl., Ex. G, ECF 45-7, at 16-18. Of these, the "Contracts," "Expected or Intended Injury," and "Loss in Progress" exclusions "apply to property damage to premises while rented to you or temporarily occupied by you with permission of the owner." *Id.* at 15 (emphasis omitted). Great Northern argues the first two exclusions work to bar coverage under all its policies, and the Loss in Progress exclusion bars coverage under its policy spanning November 1, 2017, through November 1, 2018. The court examines each exclusion in turn.

### 1.    Contracts Exclusion

The "Contracts" exclusion provides:

This insurance policy does not apply to bodily injury or property damage for which the insured is obligated to pay damages by reason of assumption of liability in a contract or agreement.

This exclusion does not apply to liability for damages:
- that such insured would have in the absence of such contract or agreement; or
- assumed in an oral or written contract or agreement that is an insured contract, provided the bodily injury or property damage, to which the insurance applies, occurs after the execution of such contract or agreement.

*Id.* at 16 (emphasis omitted).

This exclusion mirrors the occurrence analysis in that it excludes coverage for liability arising solely from Crown Pine's obligations under the lease. *See State Farm Fire & Cas. Co. v. Metro. Mgmt.*, No. 1:07-cv-00176-HG-KSC, 2007 WL 4157148, at *12 (D. Haw. Nov. 23, 2007) (finding same exclusion applied because all claims were based on obligations arising solely from a contract between the parties). As discussed above, Crosby's counterclaim sufficiently alleges "property damage" stemming from obligations arising separate and apart from the lease, including possible breaches of industry standards and other laws and regulations. Accordingly, this exclusion does not relieve Great Northern of the duty to defend.

### 2.    Expected or Intended Injury Exclusion

The "Expected or Intended Injury" exclusion provides:

> This insurance does not apply to bodily injury or property damage arising out of an act that:
>
> - is intended by the insured; or
> - would be expected from the standpoint of a reasonable person in the circumstances of the insured;
>
> to cause bodily injury or property damage, even if the actual bodily injury or property damage is of a different degree or type than intended or expected.
>  . . .

Michael Decl., Ex. G, ECF 45-7, at 18 (emphasis omitted).

As noted, when determining whether an insured's actions were unexpected or unintended, Oregon courts find "the question is whether 'the insured intended to cause the particular injury or harm, as opposed to merely intending the act.'" *ZRZ Realty*, 222 Or. App. at 469 (quoting *Ledford*, 319 Or. at 401). Oregon courts recognize that the same analysis used to determine whether a complaint alleges an "occurrence" applies to determine whether an exclusion for intentional losses applies. *Id*. at 468-69. Here, the counterclaim alleges an

"occurrence," as discussed extensively above.  Therefore, the "Expected or Intended Injury"

exclusion does not relieve Great Northern of the duty to defend.

### 3.    Loss in Progress Exclusion

The "Loss in Progress" exclusion provides:

This insurance does not apply to bodily injury or property damage that is a
change, continuation or resumption of any bodily injury or property damage
known by you, prior to the beginning of the policy period, to have occurred.

Bodily injury or property damage will be deemed to be known by you:

A.   if such injury or damage is known by, or should have been known from the
standpoint of a reasonable person in the circumstances of:
    1.   you;
    2.   any of your directors, managers, members, officers (or their designees)
       or partners (whether or not an employee); and

B. when any person described in paragraph A. above:
    1. reports all, or any part, of any such injury or damage to us or any other
      insurer
    2. receives a claim or demand for damages because of any such injury or
      damage; or
    3. becomes aware that any such injury or damage has occurred or has
      begun to occur.

Michael Decl., Ex. G, ECF 45-7, at 18 (emphasis omitted).

Great Northern contends this exclusion bars coverage for the policy year spanning

November 1, 2017, through November 1, 2018, because Crown Pine had received the

counterclaim for which it seeks coverage prior to the start of this policy period.  Indeed, the

counterclaim was originally served on Crown Pine on August 7, 2017.  Arthur Decl., Ex. 2, at

11, ECF 41-1.  As such, on August 7, 2017, Crown Pine would have been on notice of "a claim

or demand for damages because of [property damage]."  This exclusion would therefore bar

coverage for any "change, continuation or resumption of any . . . property damage known by

[Crown Pine], prior to the beginning of the policy period," or in other words, any property

damage after Crown Pine received the counterclaim.  Thus, the "Loss In Progress" exclusion bars coverages for the November 1, 2017, to November 2018 policy period, and Great Northern's motion for summary judgment is, therefore, granted for that policy year only.  Great Northern has a duty to defend Crown Pine in the underlying arbitration under its policies spanning November 1, 2015, to November 1, 2016 (ECF 45-7), and from November 1, 2016, to November 1, 2017 (ECF 45-8) only.

B.    Liberty's Exclusions

Liberty asserts that two exclusions preclude coverage under the Liberty–Crown Pine policies: the "j(6) exclusion" for incorrectly performed work and the "m exclusion" for impaired property.  Liberty Mot. Summ. J. 18, 21, ECF 40.

The j(6) exclusion is a "business risk" exclusion, a "common feature[] in commercial general liability insurance policies that are designed to exclude coverage for defective work performed by the insured."  *Mid-Continent Cas. Co. v. JHP Dev., Inc.*, 557 F.3d 207, 211 (5th Cir. 2009) (citations omitted).  "The purpose of a commercial general liability policy is to protect the insured from liability for damages when his own defective work or product damages someone else's property.  Damage to an insured's own work resulting from his faulty workmanship on it is usually covered by a performance bond, not a commercial general liability policy."  *Farmington Cas. Co. v. Duggan*, 417 F.3d 1141, 1142, 1144 (10th Cir. 2005) (applying j(6) exclusion to property damage caused by work "explicitly called for in the contract") (citation omitted).

The j(6) exclusion provides:

This insurance does not apply to:
. . .

    j.  Damage To Property

 "Property damage" to:
 . . .

        (6) That particular part of any property that must be restored,
        repaired or replaced because "your work" was incorrectly
        performed on it.

Arthur Decl., Ex. 2, at 18, ECF 41-1 (emphasis omitted).  The term "your work" means: "(1)

Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment

furnished in connection with such work or operations."  *Id.* at 29.  The terms "work,"

"operations," and "particular part" are not further defined by the policy.  However, "[b]y using

the words 'property damage' in conjunction with 'to . . . [t]hat particular part of [the] property,'"

the j(6) exclusion is "triggered only when the faulty work and the damage are to the same 'part'

of the property."  *Westfield Ins. Co. v. Miller Architects & Builders*, 949 F.3d 403, 405 (8th Cir.

2020) (alterations in original).

        Liberty asserts that the j(6) exclusion is unambiguous as applied to this case:  The "Lease

identifies both the land that is the subject of the Lease and the operations that are to be

performed," Liberty Mot. Summ. J. 21, ECF 40, and there is no allegation that Crown Pine was

working on anything other than "land that is the subject of the *insured's contract*."  *Id.* at 20

(emphasis in original).

        Rather than argue the applicability of the j(6) exclusion, Crown Pine leads its analysis by

discussing an exception to the exclusion—the "products-completed operations hazard"

exception.  Crown Pine Resp. 14-18, ECF 52.  Later in its briefing, Crown Pine briefly argues

that the term "particular part" is susceptible to more than one plausible interpretation, and points

to language in the counterclaim alleging that Crown Pine agreed to manage Crosby's "lands" and

"plantations."  Crown Pine Resp. 18, ECF 52.  Crown Pine argues this reasonably suggests the

possibility that Crosby's property is divided into "multiple different sections" and that work on one part "could have caused 'property damage'" on that particular part where Crown Pine was "not working, through erosion or otherwise." *Id.*

Courts disagree whether the phrase "that particular part" should be construed broadly or narrowly. In *Westfield Ins. Co. v. Miller Architects & Builders*, the general contractor faced an allegation "that water has come through a defectively installed roof and has damaged the finishes and electrical work in the building's interior." 949 F.3d 403, 405 (8th Cir. 2020) (quotation marks omitted). Noting that application of the j(6) exclusion "depend[s] on where the faulty work and the damage occurred," the Eighth Circuit rejected the insurer's argument that "that particular part of [the] property" meant "the whole apartment complex" under the rationale that the general contractor's "responsibility extended to the entire project." *Id.* at 405 (second alteration in original). Construing the "three consecutive limiting words," "that particular part," the court reasoned:

> The first of the three is "part," which means a "*piece*, or *segment* of a whole"— that is, something *less* than the whole. *The American Heritage Dictionary of the English Language* 1284 (5th ed. 2016) (emphasis added); *Webster's Third New International Dictionary* 1645 (2002). The second is the immediately preceding adjective "particular," which describes "some but not all of the members of a class or group," further narrowing the scope of what is excluded. *American Heritage*, *supra*, at 1286; Rodney Huddleston & Geoffrey K. Pullum, *The Cambridge Grammar of the English Language* 558 (2002). Finally, the word "that" serves a similar narrowing function by singling out one "particular part" from all others. *American Heritage*, *supra*, at 1802-03; *The Cambridge Grammar*, *supra*, at 538-39. The bottom line is that [the insurer's] interpretation reads out the words "[t]hat particular part" and would allow the excluded "part" to swallow the otherwise-included whole.

*Westfield*, 949 F3d at 405-06 (second alteration in original) (emphasis in original). Thus, the court concluded the leaky roof was on a different part of the property than the finishes and

electrical work on the building interior, regardless of the general contractor's responsibility for the whole apartment complex.

Contrary to *Westfield*, some courts have held that the insured's entire project may be the "particular part" covered by the exclusion. *See MTI, Inc. v. Employers Ins. Co. of Wausau*, 913 F.3d 1245, 1250 (10th Cir. 2019), *reh'g den* (Feb. 12, 2019) (collecting and examining cases adopting this "broader reading" of the j(6) exclusion); *e.g.*, *Jet Line Servs., Inc. v. Am. Employers Ins. Co.*, 404 Mass 706, 712, 537 NE2d 107, 111 (1989) ("Where, as here, the insured was retained to perform work on an entire unit of property, and not just a portion of it, the applicability of the exclusion to damage to the entire unit is even more apparent than in cases in which the insured was retained to work on only a part of the unit.").

Here, even applying a narrow definition of "that particular part," and assuming that Crosby's timberlands are divisible into discrete units, it is not a reasonable interpretation of the allegations giving rise to property damage that defective work on one unit caused property damage to another unit that Crown Pine was not working on. The counterclaim alleges the many ways Crown Pine breached the agreement by "cutting or harvesting of trees," "planting of trees," "control of invasive species," "establishment and maintenance of boundary lines," "maintenance of roads and fire lines," "protection of creeks, streams, waterways, and wetlands," and "controlling of soil erosion." Rossmiller Decl., Ex. 1 (Counterclaim ¶ 16), ECF 42-1. Unlike *Westfield*, nothing in the allegations supports the conclusion that Crown Pine caused damage on an area it was no longer working on, or that work performed incorrectly on one part of the property damaged some other part. To be sure, one can imagine amendments to the counterclaim that could give rise to this interpretation, but speculation is insufficient to trigger

the duty to defend.  *West Hills*, 360 Or. at 663 (indicating the question is whether the allegations could, *without amendment*, impose liability for conduct covered by the policy).

That the Oregon Court of Appeals in *Bighorn Logging Corp. v. Truck Ins. Exch.*, found the terms of the j(6) exclusion were "susceptible to multiple meanings" does not mean the same ambiguity exists here.  295 Or. App. 819, 830-31 (2019), *rev den*, 365 Or. 195 (2019).  There, the court held:

> [I]t is unclear whether the terms "work" or "operations" refer only to the insured's primary, contracted operation on the "particular part" of the property under contract or also encompasses derivative or ancillary activities on an adjacent third-party's property, including activities beyond the scope of any limited license that the insured might have to work on that property.

*Id.* at 831-32.  This ambiguity is not present here, where the counterclaim only alleges property damage to Crosby's timberlands, which is the insured's primary, contracted operations.  There are no allegations of damage to an adjacent third-party's property or any property not under the lease.

None of Crown Pine's other counterarguments have merit.  Crown Pine's argument that the insurance policies would be illusory contracts should the exclusion apply is a nonstarter.  The policies provide coverage, just not for the property damage alleged by Crosby here.  *See generally Stack Metallurgical Servs., Inc. v. Travelers Indem. Co. of Connecticut*, No. 3:05-cv-01315-JE, 2007 WL 464715 (D. Or. Feb. 7, 2007) (discussing how an insurance policy is not illusory when "potential losses occurring in a variety of other circumstances are covered").  Crown Pine also argues that because it bargained for an endorsement modifying a different exclusion, the j(5) exclusion, application of the j(6) exclusion would render the policy illusory.  However, the endorsement merely narrows the scope of the j(5) exclusion.

Thus, the j(6) exclusion precludes coverage unless an exception applies.  Crown Pine invokes the products-completed operations hazard exception.  Crown Pine Resp. 14, ECF 52. The j(6) exclusion "does not apply to 'property damage' included in the 'products-completed operations hazard,'" Arthur Decl., Ex. 2, at 18, 28, ECF 41-1, which:

> Includes all "bodily injury" and "property damage" *occurring away from the premises you own or rent* and arising out of "your product" or "your work" except:
> . . .
> (2) Work that has not yet been completed or abandoned.  However, "your work" will be deemed completed at the earliest of the following times:
> . . .
>> (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
>> . . .
>
> Work that may need service, maintenance, correction repair or replacement, but which is otherwise complete, will be treated as completed.

*Id.* at 28 (emphasis added).

Accordingly, under this exception, the j(6) exclusion does not apply to property damage "occurring away" from leased land.  Here, however, the counterclaim solely addresses Crown Pine's obligations with respect to its work on the property it leased from Crosby.  Moreover, to the extent the exception does not apply to work that "has not yet been completed or abandoned," the lease between Crosby and Crown Pine does not lapse until December 31, 2025, and Crosby specifically seeks a declaration that Crown Pine must perform "its obligations and duties under the Agreement for its remaining terms."  Counterclaim ¶ 18, ECF 41-1.  The only reasonable interpretation of the allegations is that Crown Pine's work is not yet completed.  For these reasons, the products-completed operations hazard exception does not apply.

Crown Pine again offers extrinsic evidence, i.e., a supplement to the lease agreement, which states that Crown Pine was to annually release to Crosby tracts of property that had received a "final harvest" or "clearcut."  Crown Pine Resp. 17, ECF 52.  This evidence violates the four-corners rule and has no place in the duty-to-defend analysis.  Crown Pine offers this evidence to merely illustrate a "hypothetical"; however, this hypothetical scenario is not otherwise supported by the allegations in the counterclaim.

Thus, the j(6) exclusion applies, and Liberty is relieved of its duty to defend under the Liberty–Crown Pine policies.  As this ruling is dispositive, it is unnecessary to reach the "m exclusion" for impaired property.

## V.      Conclusion

In summary, Liberty has no duty to defend Crown Pine under the Liberty–Campbell policies because Liberty has established noncoverage—Crown Pine is not an insured under those policies.  Liberty has no duty to defend Crown Pine under the Liberty–Crown Pine policies because although there is coverage, it has established that the j(6) exclusion eliminates it.

Although there is coverage under all three Great Northern policies, the "Loss In Progress" exclusion eliminates coverage for the policy with effective dates from November 1, 2017, to November 1, 2018 (ECF 51-1).  However, no exclusion precludes coverage under the remaining Great Northern policies.  Great Northern has a duty to defend Crown Pine in the underlying arbitration under its policies with effective dates from November 1, 2015, to November 1, 2016 (ECF 45-7), and from November 1, 2016, to November 1, 2017 (ECF 45-8).

//

//

//

**ORDER**

Consistent with the rulings set forth above, Great Northern's motion (ECF 44) is

GRANTED in part and DENIED in part; American States and American Economy's motion

(ECF 40) is GRANTED; and Crown Pine's motion (ECF 39) is GRANTED in part and DENIED

in part.

DATED  January 5, 2020.

    /s/ Youlee Yim You
_____

Youlee Yim You
United States Magistrate Judge
